The STATE of Ohio, Appellee,

v.

PAXTON, Appellant.

[Cite as *State v. Paxton* (1995), 110 Ohio App.3d 305.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–93–227.

Decided May 19, 1995.

306

*J. Christopher Anderson* and *James C. Walter,* for appellee.

*Norman G. Zemmelman* and *John A. Coble,* for appellant.

HANDWORK, Judge.

On April 11, 1991, an eight-count indictment was filed against appellant, William L. Paxton, in the Lucas County Court of Common Pleas. Each of the eight counts was for a separate alleged incident of recklessly operating or maintaining a "solid waste facility without a license." Appellant filed a motion to suppress all evidence seized during warrantless searches of his property that were carried out without his consent. Appellant also filed a motion to dismiss the case on the basis that the statutes he had allegedly violated were vague and ambiguous. Appellee, the state of Ohio, opposed appellant's motions.

On September 20, 1991, the Lucas County Court of Common Pleas filed an opinion and order in which it ruled that the motion to dismiss the case was denied. The trial court found that the statutes appellant allegedly violated were not vague and ambiguous. In a second opinion and journal entry filed on January 2, 1992, the trial court granted in part and denied in part appellant's motion to suppress evidence seized on appellant's property during warrantless searches conducted without his consent.

The state appealed the partial grant of the motion to suppress. On November 20, 1992, this court issued an opinion and judgment entry in which the partial grant of the motion to suppress was reversed. *State v. Paxton* (1992), 83 Ohio App.3d 818, 615 N.E.2d 1086. The case was remanded to the trial court for further proceedings. *Id.*

At trial, the state called several witnesses to testify about appellant's activities on his property. The first witness was an environmental specialist from the Ohio EPA. He testified that he reviews permit requests for solid and infectious waste facilities and recommends approval or denial. He testified that on January 15, 1991, in response to a complaint, he went to appellant's property at 2519 Michigan Street, Toledo, Ohio to observe conditions there. While he was on the stand, he identified a videotape he had filmed during his visit. The videotape was later shown to the jury out of the presence of the trial judge, and the audio portion of the tape was also played over the objection of appellant.

While the witness was still on the stand he was asked the following about his visit: "Now, what types of solid waste did you see and what types of demolition debris did you see?" He responded: "I seen—I saw household garbage or commercial garbage. It's solid waste. And I seen some demolition debris like concrete blocks, some woods, things like that?" He said he saw the debris all over the property. He especially noticed a big pile of materials in the middle of the property near a large machine. He stated: "It was a huge, huge pile. And as I recall there was a lot [sic] amount of solid waste in it. It's not demolition debris only, and it was solid waste. There was solid waste in it." When he was asked to point out on a map of the property where he saw the solid waste, he approached the map and stated: "I saw a lot of garbage. Even when I was walking here, I—I saw appliances, and that's—that's solid waste, scattered off all over." He also stated: "And I saw the piles also. There are—there are tremendous amount [sic] of solid waste in it."

The next witness called by the state was a sanitarian for the city of Toledo Health Department. He accompanied the Ohio EPA official on the January 15, 1991 visit to appellant's property. He also returned to the property on several other occasions. He testified that he saw buried solid waste on an open working face at the edge of the site and in a large pile next to a machine in the center of the property. When he was pressed to identify what he saw that constituted solid waste he referred to office papers that he collected "from several different locations."

A third witness who testified on behalf of the state was a supervisor from the city of Toledo Health Department who is also a registered sanitarian. He went to appellant's property on several occasions. He testified that each time he went to the property he saw "a big mound of garbage" located next to a large machine called a hammer mill. He also saw "[a] lot of exposed trash, commercial and household waste trash." He testified that the trash was buried on the site.

On cross-examination, he admitted that a "graveyard of tires" which had been referred to was not located on appellant's property. However, on redirect he insisted that he had seen "garbage, trash" buried on appellant's property.

At the close of the state's case, appellant renewed his objection to the admission of audio portions of videotapes taken by the state's witnesses on his property. He also made a motion for a directed verdict. Both the renewed objection and the motion for a directed verdict were overruled.

Appellant then presented a defense. He called a long-time resident from the neighborhood near his property as a witness. The resident testified that he recalled the city dumping truck loads of material on the property in the early sixties.

Other witnesses included a retired employee from appellant's business and a man and a woman who made their livings by sorting through the materials brought to appellant's property and retrieving recyclable materials. All three witnesses testified that appellant had strict rules prohibiting the dumping of garbage on his property, and that all the garbage and nonrecyclable materials that were not demolition debris were sorted and taken by the truckloads to approved, licensed landfills. They testified that the large pile in the middle of the property was sorted for recyclable material, waste that had to be taken to a solid waste landfill was removed and transported elsewhere and the remaining demolition materials were run through the machine and reduced to fill. However, the pile was large when the government inspectors were on the property and had not yet been sorted because the machine was broken.

Appellant called a partner from a consulting and engineering company who formally worked for the Ohio EPA. He testified that when he worked for the EPA he had enforcement responsibility regarding the statutes and regulations relating to solid waste facilities. He stated that the definitions relating to solid waste were unclear and were difficult to enforce because of their vagueness. He testified that when garbage was present at a site, it attracted vectors, like flies, rodents and birds. The partner testified that under his direction test pits were dug into the materials at appellant's property with heavy machinery. Other than wood and steel pipes, nothing was found in the pits that could be classified as solid waste. He also testified that it was his expert opinion that appellant was not operating a solid waste facility. He explained:

"My—the reasons for my opinion are that what I observed was not a large quantity of solid waste at the facilities. And in my years of experience, I have seen a number of operations that have had some solid waste materials, whether it's litter papers, you know, that are at the operations, whether they're an industrial facility or whether they're a recycling facility, for that matter, there are oftentimes waste materials around.

"And I've—I have seen at the Paxton facility some papers. I've seen some plastics. And I would have to say I've seen some garbage bags. I don't know

what's in those garbage bags. But I have not seen in my opinion that would constitute, you know, a solid waste disposal facility."

Finally, appellant took the stand on his own behalf. He testified that he only kept demolition materials on his property. He testified about extensive recycling that was done after materials were sorted, and explained that the large machine next to the pile of materials referred to by the other witnesses was a hammer mill he had invented. The hammer mill could crush demolition debris and could reduce seven truckloads of material to one truckload of material. Shortly before the time the inspectors from the Ohio EPA and the City of Toledo Health Department visited his property, the machine broke down and sorting and crushing operations were temporarily halted until repairs could be made. Appellant denied keeping solid waste on his property.

On May 11, 1993, the jury in this case returned its verdicts. The jury found appellant guilty on Counts 1, 2, 5, 7, and 8. The jury found appellant not guilty on Counts 3, 4, and 6. Appellant filed a motion for a modification of the verdict or a new trial. Appellant argued that the guilty verdicts were against the manifest weight of the evidence, that special findings made by the jury showed that the convictions were based upon elements of a crime for which appellant was not charged, and that the statutes under which appellant was charged were vague and ambiguous.

On July 6, 1993, the trial court filed a judgment entry in which it sentenced appellant to two years of imprisonment for each count for which he was convicted. The court also imposed a $25,000 fine and ordered appellant to pay the costs of prosecution. The court suspended the incarceration order and placed appellant on probation. As part of the condition of his probation, appellant was ordered to demolish five abandoned houses for the city of Toledo within one year of his sentence. The court also ruled that the fine could be worked off by appellant if he demolished up to ten additional abandoned houses for the city of Toledo.

On April 2, 1993, appellant filed a notice of appeal. He has presented six assignments of error for this court's consideration. The six assignments of error are:

"*Assignment of Error No. 1:*

"The trial court erred in failing to dismiss all counts herein, as the charges against the defendant were based upon vague and overbroad statutes, thus violating the Fourteenth Amendment to the United States Constitution as well as Article I, Section 16, of the Ohio Constitution.

"*Assignment of Error No. 2:*

"The trial court erred in failing to grant the defendant's motions for acquittal, as the evidence was insufficient to sustain conviction on the offenses charged.

"*Assignment of Error No. 3:*

"The trial court erred in failing to modify the verdicts herein, or order a new trial, as the evidence was insufficient to sustain conviction on the offenses charged.

"*Assignment of Error No. 4:*

"The trial court erred in failing to acquit the defendant, modify the verdicts herein, or order a new trial, as the verdicts of guilty which included the special findings of the jury were inconsistent with the offenses charged.

"*Assignment of Error No. 5:*

"The trial court erred in instructing the jury with vague and overbroad statutory definitions rather than with specific and narrow instructions consonant with the offenses charged.

"*Assignment of Error No. 6:*

"The trial court erred in permitting the jury, over the defendant's objections, to hear the audio portion of the state's videotape evidence which contained irrelevant, inadmissible, and highly prejudicial testimony adverse to the defendant."

 We begin by considering the law concerning demonstration that a statute is unconstitutionally vague. Both parties acknowledge that there is a strong presumption that a statute is constitutional. *State v. Collier* (1991), 62 Ohio St.3d 267, 269, 581 N.E.2d 552, 553–554. The party challenging the statute as unconstitutional must "show that upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law." *Id.* at 269, 581 N.E.2d at 554. Furthermore, the challenger must show (1) the statute does not give warning to the ordinary citizen of what is required; (2) the statute does not preclude arbitrary and capricious enforcement; and (3) the statute does not ensure that constitutionally protected rights are not unduly infringed. *Id.* at 271, 581 N.E.2d at 554–555. To be considered vague "a statute must be vague in all of its applications, assuming the statute implicates no constitutionally protected conduct." *Id.* at 272, 581 N.E.2d at 555. When a criminal statute is involved, the strict construction of criminal provisions must be tempered with common sense and "evident statutory purpose." *State v. Sway* (1984), 15 Ohio St.3d 112, 116, 15 OBR 265, 268–269, 472 N.E.2d 1065, 1068. Keeping all of these standards in mind, we now turn to the specific arguments presented by the parties relating to the first assignment of error.

 Appellant argues that he should not have been convicted of operating a solid waste facility because he was in actuality conducting a demolition disposal and recycling business on his premises. Appellant argues that his actions were

not prohibited by R.C. 3734.01. He begins his analysis by pointing to the definition of "solid wastes" found in R.C. 3734.01(E), which provides:

" 'Solid wastes' means such unwanted residual solid or semisolid material as results from industrial, commercial, agricultural, and community operations, excluding earth or material from construction, mining, or demolition operations, or other waste materials of the type that normally would be included in demolition debris, nontoxic fly ash and bottom ash, including at least ash that results from the combustion of coal and ash that results from the combustion of coal in combination with scrap tires where scrap tires comprise not more than fifty per cent of heat input in any month, spent nontoxic foundry sand, and slag and other substances that are not harmful or inimical to public health, and includes, but is not limited to, garbage, scrap tires, combustible and noncombustible material, street dirt, and debris. 'Solid wastes' does not include any material that is an infectious waste or a hazardous waste."

Appellant outlines the provisions of R.C. 3734.01(E) as follows:

- unwanted residual solid or semi-solid material
 - resulting from
 - industrial
 - commercial
 - agricultural
- and - community operations
 - excluding
 - earth or material from
 - construction
 - mining
 - or - demolition operations
 - or - other waste materials of the type that would normally be included in demolition debris
- but including
 - garbage
 - tires
 - combustible and non-combustible material
 - street dirt
 - debris

Appellant argues that the materials on his property fit into the exclusion for earth or materials from demolition operations or other waste that would normally be included in demolition debris. Appellant further argues that the definition is vague and overbroad because the term "unwanted" is unclear (unwanted by whom, at what time), the term "garbage" is undefined, and the term "debris" is undefined. Appellee counters that appellant has expertise in demolition disposal and solid waste hauling, so he should know what these terms mean. Appellee's argument is misplaced, since the expertise of appellant is irrelevant in an analysis of whether or not a statute is vague. As previously noted, the Supreme Court of

Ohio has adopted a three-part test for determining whether a statute is vague, and the first prong of the test is whether the provisions of the statute give fair warning to the ordinary citizen of what is required. *State v. Collier*, 62 Ohio St.3d at 271, 581 N.E.2d at 554–555. The challenged terms must therefore be evaluated to determine whether the ordinary citizen would understand their meaning.

R.C. 1.42 directs the courts of Ohio as follows:

"Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

At trial, the Ohio EPA employee testified as follows regarding the definition of garbage:

"When you say garbage, it's like the household garbage. You know, we have— we all use garbage cans in our houses, and, you know, for unwanted material. Sometimes we get a lots of mails, for example, papers, we put them in the garbage because we don't want them. We don't need them. So we put them in the garbage.

"And then when the collectors comes, we put it outside. They come to take it to haul it away for proper disposal. This is what I call garbage.

"Same thing for commercial. You know, if they don't want something, you know, they put it in the garbage, and the collector will come over and haul it away. So this is they call it unwanted material."

The consultant called by appellant was asked the same question and he gave the following response:

"To me garbage is waste material, falls in the definition of a solid waste. But it would come to me it means putrescible-type matter.

" * * *

"I mean it's—it's highly organic. It's a potential food source for vectors which would be rodents, flies, birds. It has high organic content that it's—when decomposed it would create objectionable odors. I think you'd say that—that it would be the historic definition of what garbage is.

"Garbage historically, not in current times, but in probably the presixties or seventies had a high moisture content and a lot of food waste in it. And people commonly referred to what we call nowadays probably solid waste, they referred to it as garbage because it had that higher percentage of organic material from food waste, and now days the solid waste content has changed, and there's·

probably or [sic] 40 or 50 percent paper in our normal solid waste that's generated and disposed.

"So the definition of what garbage is has narrowed, in my opinion, has narrowed down to a very small portion of what solid waste is."

The definitions given by both witnesses contain similar ideas and inferences regarding the meaning of unwanted, i.e. that the item is no longer desired by the generator, and contain similar ideas and inferences regarding the meaning of garbage, i.e. food, paper and other waste discarded from a household or commercial establishment. Furthermore, a review of definitions found in Webster's Collegiate Dictionary shows that the definitions given by the witnesses matches the commonly understood meaning of the terms unwanted and garbage.

According to the dictionary, to "want" means "something wanted: NEED, DESIRE * * *." Webster's Ninth New Collegiate Dictionary (1989) 1327. Conversely then, if something is unwanted it is not needed or desired by its possessor. "Garbage" means: "1 a: food waste: REFUSE b: unwanted or useless material * * *." Id. at 505.

Finally, we note there is a commonly understood meaning for the term debris. According to the dictionary "debris" means: "1: the remains of something broken down or destroyed: RUINS 2: an accumulation of fragments of rock." Id. at 328. Accordingly, we reject appellant's assertion that these terms are vague.

Therefore, we turn our attention to appellant's argument that the term "other [waste materials] of the type that would normally be included in demolition debris" is unclear. Appellant argues that other waste materials of the type that would normally be included in demolition debris encompass all of the material found at his premises, since all of the material was the result of his demolition operations. Appellee responds that the phrase cannot be interpreted to include the solid waste the witnesses saw on appellant's property, and asserts that when the term "other [waste materials] of the type that would normally be included in demolition debris" is construed in the context of the statute, it becomes clear that solid waste is eliminated from the definition of demolition debris.

We note that the statute does not itself define what is meant by the phrase "other [waste materials] of the type that would normally be included in demolition debris." However, regulations published in the Ohio Administrative Code to accompany the statutory section under examination do give a more complete definition of the term "demolition debris."

The version of the regulation relating to R.C. 3734.01 that was in effect at the time appellant was indicted contained the following definition:

"(UU) 'Solid wastes' means such unwanted residual solid or semisolid material as results from industrial, commercial, agricultural, and community operations, excluding earth or material from construction, mining, or demolition operations, or other waste materials of the type that would normally be included in demolition debris, nontoxic fly ash, spent nontoxic foundry sand, and slag and other substances that are not harmful or inimical to public health, and includes, but is not limited to, garbage, tires, combustible and noncombustible material, street dirt, and debris. Solid waste does not include any material that is an infectious waste or a hazardous waste.

"For the purpose of this definition, 'material from construction operations or demolition operations' are those items affixed to the structure being constructed or demolished, such as brick, concrete, stone, glass, wallboard, framing and finishing lumber, roofing materials, plumbing, plumbing fixtures, wiring, and insulation, but excludes materials whose removal has been required prior to demolition." Former Ohio Adm.Code 3745–27–01, 1989–90 Ohio Monthly Record 1005, effective March 1, 1990.

Testimony at trial established that the city health department has requirements that carpeting, asbestos, appliances and other waste, such as stockpiles of tires, be removed from a site before it is demolished. An individual who questioned the exclusion in the above quoted regulation of "materials whose removal has been required prior to demolition" would be responsible for checking on existing rules and regulations to discover what materials must be removed. Accordingly, an ordinary individual could clearly understand what "other [waste materials] of the type that would normally be included in demolition debris" means after consulting the pertinent regulations: materials that are not permanently affixed to a building and which must be removed from the building prior to demolition pursuant to existing law. We find that the statute in question is not unconstitutionally vague. Appellant's first assignment of error is not well taken.

We next consider appellant's sixth assignment of error concerning the admission of audio portions of the videotaped evidence. The record shows that appellant entered several objections to the playing of the audio portion of the videotapes to the jury. Each time the objection was overruled. Appellant objected on the grounds that the statements were hearsay, that the statements were cumulative, and that the statements were more prejudicial than probative. The trial judge overruled the objections and held that the audio portions of the tape were admissible pursuant to Evid.R. 803(1) as present sense impressions. When the videotapes were played for the jury, the audio portions were played, and the trial judge was not present in the courtroom.

After the videotapes, including the audio portions, were played for the jury, appellant made the following motion:

"Your Honor, the record of course reflects that in the Court's absence the various videotapes were played with the audio portion to the jury, and it was over our objection and continuing objection that the audio portion was permitted.

"Now, it's a difficult argument to make at this juncture because the Court of course wasn't here and didn't hear the audio. But based upon the tape, and in particular the audio portion of the tape, we have to move for a mistrial.

"The audio portion of the tape, Your Honor, was highly prejudicial and inflammatory. There was reference made to a death at the site without an adequate explanation as to the cause of the death, leaving the impression that perhaps the activity going on there was somehow responsible.

"There was continuous conjecture and speculation advanced on the tape or in the audio portion of the tape as to where things were going and what things were.

"There was reference to wetlands. There was reference to the Army Corps of Engineers having trouble—or jurisdiction over wetlands and being concerned or having to be contacted or words to that effect.

"And there was also filming and audio of things that weren't even on the site. There's one rather profound picture of what's described on the audio as a graveyard of tires which isn't even on the site of the property which is involved. And there's another picture of a tire floating down this little creek which has absolutely nothing to do with Mr. Paxton's operation or Mr. Paxton's property.

"And I know the argument is going to be—and the Court said, well, we can cross-examine on those things—but the harm and the impact, it's a question of— in cross-examining what you have to do is repeat and rephrase everything which hurts you once. You have to do it again. And I don't believe any form of cross-examination or explanation can cure the prejudicial effect of the jury listening, having listened to those comments on the tape."

After listening to the state's reply to the motion, the trial judge determined that the audio portions of the videotapes went beyond present sense impressions, and contained editorial comments. The trial judge explained that she believed the audio portions of the tapes were merely going to explain what was being seen, and she stated: "I'm willing to give a limiting instruction with respect to other information that should not have been heard." The trial judge denied the motion for mistrial, but did read a limiting instruction to the jury regarding the statements from the audio portion that did not qualify as statements of a present sense impression.

Appellant argues that many of the statements on the audio portion of the videotapes exceed the scope of a present sense impression. For example, while filming the hammer mill, the inspectors made statements about a death caused by the machine when it malfunctioned some weeks before the inspectors were present, and before the filming was taking place. Appellant also argues that many of the statements were irrelevant to the charges pending against him. For instance, some reference was made by the inspectors that some of the property filmed could qualify as wetlands, a piece of information that is irrelevant to the charge of operating a solid waste facility without a permit. Finally, appellant argues that even if the statements could be construed as relevant, they were more prejudicial than probative, and should have been excluded from trial. Appellant summarizes his arguments as follows:

"The problems caused by the admission of this evidence could not be cured by cross-examination or limiting instruction after-the-fact. The jury's exposure to this material unfairly prejudiced the defendant, and prevented him from having a fair trial. It should never have been admitted, and having been admitted, the trial court ought to have granted a mistrial and a new trial."

Appellee responds that the statements on the audio portion of the videotapes are not hearsay because they fit within the present sense impression exception found in Evid.R. 803(1). Appellee also responds that the statements are relevant pursuant to Evid.R. 402, and that the statements are not more prejudicial than probative, as defined by Evid.R. 403. Appellee contends that any prejudice which may have occurred was cured when the trial court gave the jury a curative, limiting instruction. The limiting instruction the court gave was:

"The only video comments which you are allowed to consider in your deliberations are those which relate to what is being shown which are descriptive of what is being shown. Events which were unrelated to allegations in the indictment and any speculation such as what may happen to certain waste which was being shown is not to be considered by you for any purpose.

"So anything that you heard was to relate solely to what was being seen at the time. Any speculation is not to be considered by you for any purpose. Will everyone do that for me?"

This court has concluded after reviewing the entire record that appellant should have been granted a mistrial. As this court has previously noted:

" 'The judge of the court of common pleas is an essential part of the court, and his presence during the trial is necessary to its proper conduct. He should be at all times within sight and hearing of the proceedings, so that he will retain control of all that transpires during the trial and can instantly exert his authority

when it is required. This rule applies especially to the trial of a criminal case.' *Miller v. State* (1906), 73 Ohio St. 195 [76 N.E. 823], paragraph two of the syllabus.

"When, in the absence of the judge, an error occurs which prejudicially affects the merits of the case and the substantial rights of a party, a mistrial should be ordered. *Tingue v. State* (1914), 90 Ohio St. 368 [108 N.E. 222], paragraph three of the syllabus. See, also, Crim.R. 33(A)." *State v. Porter* (Dec. 16, 1994), Erie App. No. E–93–52, unreported 1994 WL 700728.

The inclusion of all of the audio portions of the videotapes constituted prejudicial error in this case, as several statements which were played for the jury were either outside the scope of a present sense impression, were irrelevant to the charges pending against appellant, or had more prejudicial impact than probative value. Accordingly, the statements should have been excluded pursuant to Evid.R. 402, 403(A), or 803(1). The curative instruction was insufficient to remedy the error that occurred. Appellant's sixth assignment of error is well taken.

Our ruling on the sixth assignment of error renders the second, third, fourth and fifth assignments of error moot.

Because this court finds appellant was prejudiced and prevented from having a fair trial, the judgment of the Lucas County Court of Common Pleas is reversed. This cause is remanded to that court for further proceedings consistent with the decision of this court. Appellee is ordered to pay the court costs of this appeal.

*Judgment reversed*
*and cause remanded.*

ABOOD, P.J., and GLASSER, J., concur.